Thank you, Your Honor. May it please the Court. This is a dispute between A & R Engineering and the City of Houston. The Attorney General has nothing to do with it. For one, the Attorney General is entitled to sovereign immunity. In the District Court, A & R Engineering gave one reason for its decision to sue the Attorney General. That was the Attorney General's alleged duty to enforce and defend the constitutionality of Texas state law. But time and again, this Court has held that such generalized duties do not create the enforcement connection required by Ex parte Young. That is where the analysis should end, but even if sovereign immunity was absent and A & R Engineering had pre-enforcement standing against the Attorney General, A & R Engineering failed to show a likelihood of success on the merits. If accepted, A & R Engineering's arguments would create a circuit split with the Eighth Circuit, which recently held, under Rumsfeld v. Fair, that an indistinguishable Arkansas statute did not violate the First Amendment. Returning to jurisdiction, the Ex parte Young exception to sovereign immunity requires the plaintiff to show that the defendant official both has the particular duty to enforce the statute in question as well as a willingness to enforce it. The complaint, and this is the case, the Attorney General, quote, is responsible for enforcing and defending the constitutionality of Texas law. But as this Court held just this year in Texas Alliance for Retired Americans against Scott, the general duty to see that the laws of the state are implemented is not enough. That's why, in that case, the fact that the Texas Secretary of State is the state's chief election officer did not entitle the plaintiffs to sue him and challenge a law eliminating straight ticket voting. Now, on appeal, A & R Engineering has shifted to some other authorities that it did not cite in the district court. One of those is Texas Government Code Section 808.102. Now, it's important to understand that Texas's anti-boycott statute has two parts. One, the statute at issue, is in Chapter 2271 of the Government Code. That applies to state and local contracts. The other section is in Chapter 808 of the Government Code, and it requires the state of Texas to divest from certain companies that boycott Israel. The statute A & R Engineering cites explicitly only applies to Chapter 808. If anything, it shows the legislature considered and decided that the Texas Attorney General would only have specific enforcement authority with respect to Chapter 808. A & R Engineering also alleges that the Attorney General might be able to bring a lawsuit to restrain a municipality, or bring a quo moroncto suit. First, these do not appear in the complaint, and as this court observed in Haverkamp v. Linthicum, the ex parte Young Connection allegation should appear in the complaint. But even if the argument was preserved, neither authority is specific to the anti-boycott statute. In fact, the authority to bring an ultra-various lawsuit isn't even specific to the Attorney General. Any citizen in the state of Texas can bring such a lawsuit. But you think, I assume you would agree that the Attorney General could bring such a suit? He could, in theory, yes. He's never done so with respect to the anti-boycott statute. I assume there's no statutory authorization for the Attorney General to bring a quo moroncto action for violation of the vaccine mandate executive orders, either? Yes, I am not aware of any specific authority with respect to the quo moroncto tying that to any specific statute. It's just a general freestanding authority that the AG has to ensure that other officials are following state law? Yes, yes. And it doesn't reflect a particular duty to enforce the statute in question. But even if there was a particular duty to enforce this statute, the company has not shown that the Attorney General has a willingness to enforce the statute. The company doesn't cite any previous attempt by the Attorney General to enforce the statute. Instead, it argues the Attorney General threatened enforcement in this court in our response to A&R Engineering's suggestion of mootness. First, we did not threaten enforcement in that document. A&R Engineering argued that somehow our appeal from the preliminary injunction was moot, while at the same time the case should press forward against him in the district court. And we pointed out that the preliminary injunction continued to remain in effect by its terms and applied during performance of the contract. Cases don't require a showing that the AG has, you know, filed these matters, right? I mean, could, based on, I get the argument about he can't be too general with it, but on the other hand, because I understand the law, there's no requirement to show he did it here, he did it here, he did it here. So, I mean, you're making the argument based on actual conduct. That's not the standard, is it? Well, there does need to be a showing of some previous willingness to enforce the statute. And even if the response for, the response to the suggestion of mootness did threaten enforcement, it can't support jurisdiction in the district court, which is measured at the time that the complaint is filed. So, the fact that A&R Engineering doesn't cite any previous attempt by the Attorney General to enforce the statute at the time the complaint was filed is enough for the Attorney General to remain entitled to sovereign immunity. Well, in the initial motion to dismiss, did the Attorney General, was sovereign immunity even raised then? Sovereign immunity was not raised in the district court, but because sovereign immunity goes I'm not suggesting it's waived, I'm just asking as a historical fact, it wasn't raised. Yes, it was not raised below. It is in our answer that we filed in the district court, but it is not something we argued in opposing the motion for the preliminary injunction. The AG would have no authority to void the contract between the city and A&R, correct? Well, the ultra-virus lawsuit that could potentially be brought would, I suppose, argue that the municipality acted in violation of the Texas anti-boycott statute, and that could conceivably have the consequence of voiding the contract, but again, we've never, these are sparingly used authorities, the power to bring an ultra-virus lawsuit, we've never done that in connection with this lawsuit, and that's enough to foreclose the possibility. Is there any government official, AG or otherwise, who has the authority to void or render unenforceable? Well, the statute puts the city of Houston in the driver's seat here. The statute puts the obligation on the city of Houston to put this language in the contract, and so the city of Houston, of course, is a proper defendant. We don't dispute the fact that A&R Engineering had standing to sue the city of Houston, but the Attorney General has no part of this dispute. If you look at the complaint, A&R Engineering alleges that it asked Houston to take the language out of the contract. Houston said no, and that's why they are the right defendant. If the city of Houston, the city attorney or whomever, was okay with it, I guess ultimately they offered a contract where it wasn't in there, so if they said, oh, okay, or up in Marshall, Texas or somewhere else, they say, okay, fine, press ahead. I mean, is the argument the Attorney General is charged generally with enforcing the law across the state, uniformity, et cetera, et cetera, I mean, just would sit back and let it happen, or otherwise not opine to the city attorney, hold it up, hold it up, you know, here's what the statute says, et cetera? I think it's possible that the Attorney General would perhaps weigh in, but I wouldn't want to speculate about that possibility. We're not aware of any local governments that have . . . The city attorney would have said, this is fine with us, or let's say the city attorney, I guess Texas does the same, they get an Attorney General's opinion, you know, whether this can happen or not. The AG says, no, can't do it. The city attorney could just say, fine, that's your opinion, but we're doing it anyway? I mean, the AG couldn't avoid or negate the action that the city attorney would be perfectly willing? Do you understand my question? I think so, but . . . I'm just trying to get past the general notion of what the Attorney General's duties are versus just, if you're okay with it, I'm okay with it, and the responsibility to, you know, enforce the law, you know, as on the books. Right. But this statute, it doesn't contemplate the Attorney General having a role in its enforcement. That's the other part of the anti-boycott statute, Chapter 808, which quite into the statute's enforcement. Chapter 2271 is silent on any role for the Attorney General. It states that government entities have to include this language in the contract, and that's it. So even if the Attorney General was not entitled to sovereign immunity, A&R Engineering also lacks pre-enforcement standing against him for many of the same reasons that he is entitled to sovereign immunity. And even if A&R Engineering had jurisdiction with respect to the Attorney General, the District Court still erred in entering a preliminary injunction against the state of Texas. The state of Texas is not a party to this lawsuit. If it was, it would be entitled to sovereign immunity, and A&R Engineering does not defend that aspect of the preliminary injunction. Turning to the merits, this statute does not violate the First Amendment. The statute limits itself to economic conduct, and economic conduct is not entitled to First Amendment protection. How do we know the statute — Let me make sure I understand the scope of that argument. So suppose instead of saying this violates my First Amendment speech rights, suppose that the contractor in this case said it violates my rights of conscience and my religious liberty rights. And I'm — totally different series of cases, totally different series of protections, totally different constitutional provenance, and I can't — I cannot be forced to choose to sign this contract or offend my religious liberty. What's the result? I am not sure, Your Honor. I — you know, we haven't really even seen that type of allegation in connection with these sorts of contracts that I'm aware of. Yeah, certainly not. That's why — but when you say First Amendment, I just want to make sure. I'm — I obviously understand this is a speech case, but I — Yeah, yeah, yeah. I'm really confining my argument to the speech and association arguments that we have seen raised in connection with these — these statutes. And again, what's important is that this is just limited to economic conduct. The statute provides a definition for boycott Israel. It says boycott Israel means a refusal to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations. The Eighth Circuit recently interpreted a very similarly worded statute, concluded that that statute only prohibited purely commercial, non-expressive conduct. And that's because of the application of the Eustim generis canon of statutory interpretation. Do you agree that the law does permit the refusal to deal with Israel generally, but it seems to only kick in when that refusal is motivated by this BDS viewpoint. Is that right? You could have a blanket, we don't want to deal with Israel generally policy, and that would be — that would not run afoul of this provision? Is the provision only kick in when the refusal to deal is motivated by a BDS viewpoint? No, it does not only kick in when it's motivated by a BDS viewpoint. It kicks in when there's a discriminatory intent. It's not unlike other discrimination statutes that require a proof of intent, and that's why this statute has the language about an intention to penalize, inflict economic harm on, or limit commercial relations in contrast with the ordinary business purposes language. And so the Supreme Court addressed what type of conduct is entitled to First Amendment protection in Rumsfeld v. Fair. It held that conduct must be inherently expressive, and economic conduct by itself is not inherently expressive. This case is similar to that case. There, the U.S. Congress enacted the Solomon Amendment to respond to an organized protest by law schools to the U.S. military's don't ask, don't tell policy, and the U.S. Supreme Court held that that statute's requirement that law schools treat military recruiters the same as they treat recruiters for other employers, nothing about that was inherently expressive because the exclusion of recruiters by itself doesn't convey anything. Finally, A&R Engineering also argues that this statute compels speech in violation of the First Amendment. That argument conflicts not only with the Eighth Circuit's 9-1 en and Ali v. Hogan. Rumsfeld v. Fair also addressed compelled speech and held that the fact that law schools would have to advertise the fact that military recruiters would be on campus did not compel speech in violation of the First Amendment. But this does require contractors to state that they are on board with Texas's anti-BDS position, right? Well, I disagree with that characterization. It requires them to state that they are not going to engage in economic discrimination against Israel at present and during the life of the contract. And it's only certain size contracts, right? It is, yes. This statute is tailored to large government contracts in excess of $100,000. It excludes small contractors who have fewer than 10 employees. And it's also tailored to the desire to make sure that tax dollars are not subsidizing economic discrimination. The statute is only triggered where public funds are being used to finance the contract. Thank you, Your Honors. Mr. Abbas. Good morning, Your Honors. May it please the Court. My name is Kadir Abbas. I'm appearing for Applea. My colleague on the other side, I believe, gave the game away when he spoke about the law having a requirement that it looks to the intent. That's very important, and that's an indisputable character feature of the Texas law. If you look at the definition of boycott, at the very end, in the residual clause, it says, but does not include an action made for ordinary business purposes. Mr. Abbas, can I push pause for a second? Can we jump back to pre-merits? Yes, Your Honor. Am I correct that A&R has now obtained the contract with the city without the offending provision, correct? Yes, Your Honor, that's correct. So, what is your injury now? Why isn't this moot? Well, we think that we did file a suggestion of mootness based on having received the contract and the contract being executed without the anti-BDS clause, but the Attorney General's office, in opposition to our suggestion of mootness, explains its ongoing interest in enforcing this action and creating the possibility of the Attorney General taking an action to invalidate the contract. So that ongoing ability of the Attorney General to do something to avoid and invalidate the contract is, in our view, the sole basis for this appeal not being moot. But, of course, whether or not this appeal is moot, these contracts are periodically submitted every three years. Rusme Hasuna has a long history of contracting with the case, which, in our view, is not moot. Well, just because it may be up for renewal in a few years, that's just kind of tees up ripeness, in my view. Why isn't it unripe at this time? Well, we think that that question should go first to the district court, certainly. But constitutional litigation takes some time, and so a three-year timeline for Rusme Hasuna receiving a new contract that would then contain absent courts intervention and anti-BDS clause in it, we believe would be a foreseeable injury on the horizon that would allow this court to issue an injunctive relief. And so if I've answered Your Honor's pre-merits questions, moving back to the merits, that last phrase that... Before you go to merits, go back to the opening salvo, you know, the whole sovereign immunity question, et cetera. Well, Your Honor, they weren't arguing this below because they wanted to defend the law, in our view. And I think the proceedings at the preliminary injunction hearing themselves, where the state of Houston lawyers showed up, not looking to defend the law in any kind of substantive way, underscore the practical reality that the Attorney General is the one that's going to defend this law. But again, even if there is any ex parte problem, it would be limited to the AG at this appellate stage. It would not extend to the city of Houston down below. Now, carefully we'll tiptoe back to the merits. What the plain language of the law does is it inverts the typical constitutional hierarchy of values. To Judge Willett's point, you can boycott Israel under the Texas law. You can boycott Israel if you do so as part of an effort by suppliers to prevent certain kinds of Israeli products to enter the U.S. market or to do anything, quote, made for ordinary business purposes. And when you look at the actual text, that's the only action that is expressly permissible. That's the only boycott action that's expressly permissible. It's the one that's done for economic reason. And because of that, this Court can't go and rewrite the language of the meaning of this statute without jettisoning its clear examination of the reason, the intent behind someone's conduct. And here, it is not enough under the law to boycott Israel. You must boycott Israel for an expressive purpose. If you boycott Israel for a commercial purpose, the law does you no wrong. If you do so for an expressive purpose, that's the only time that the law affects. So suppose an employee of a Texas state agency goes to his boss and says, hey, I'm going to a political rally today. And the boss says, no problem. Have a great time. Obviously take the day off and don't drive your state-issued vehicle to the political rally. He says, oh, my gosh, this is infringing my First Amendment rights, right, because the reason I'm going is an expressive purpose, and I'm being docked a day's pay, and I'm not allowed to take my vehicle. I'm allowed to take my vehicle anywhere. I can take it on personal errands to the dry cleaner. I can go take my wife out to lunch. But I can't take it to the political rally. The only thing my boss says I can't do with my vehicle and the only thing he's going to dock me a day's pay for is an expressive purpose of going to the political rally. Is that a violation of the First Amendment? Yes, Your Honor. Really? So all of Chapter — so Chapter 556 of the Texas Government Code, which has been around for a long time, has all sorts of restrictions on what government employees can do, both when they're on the payroll and when they're using state-issued vehicles or state-issued resources. That's — does that all fall under the First Amendment? Well, perhaps I misunderstood the question, Your Honor. But I think this goes back to Colby Richardson and Cramp in the Atlanta cases where the Supreme Court really spelled out what kinds of restrictions can government employers place on employees. And many of those restrictions include, you know, some things like time, place, manner. You can't use government property. You can't — you know, and those things are fine. But what Colby Richardson makes very clear is, quote, employment may not be conditioned on an association of activities within constitutional protection. And that's my question, is what is the scope of the constitutional protection? So the state employee says, I'm taking — I got to — you know, tomorrow's Election Day. I'm going to the rally. And the guy says — the supervisor says, no problem. Have a great time. But you're not going to get paid by the state of Texas, and you're not taking a vehicle with the state of Texas' seal on it to the political rally. And I heard you say earlier that violates the First Amendment. No. Well, if the employee — if the government employer, for example, was treating time off for one reason versus time off for another reason — so let's say, for example, the government employer said, I will give you a sick day if you're going to the doctor, but if you're going to take a day off to go to the protest, then the time off that the employer is providing the employee is no longer viewpoint neutral. That's exactly what I'm asking. So make it — the only reason you can't get paid today is because you're going to an openly partisan, openly political event. You cannot be on our payroll, and you cannot receive our money, use state resources, or take state vehicles to the political rally. That violates the First Amendment. Well, some of the concerns around appearance emanate from the reasonable desire for government to have folks that represent the agencies to not appear, like you said, at hyper-partisan events. And so let's say, for example, this law, instead of saying — instead of just boycotting expressive conduct targeting Israel, boycotted all — I'm sorry — restricted all kinds of boycott, whether it's done for economic or expressive reasons. Then we would be closer, Your Honor, to I think the example that you're suggesting. But this is easier. This is a bit of a layup because the Texas law carves out what is disfavored, the commercial conduct. If you have a commercial reason for your conduct, you can do it. But if you have an expressive reason for your conduct, you can't. So California passed a statute a few years ago that prohibits state employees from using state resources to go to 23 different states, including all three of the states in the Fifth Circuit. But there are carve-outs for approved business purposes, litigation, et cetera. But — so leaving only the disfavored conduct, as you put it. So those violate the First Amendment, too, I assume. Well, I — so I think this Court just, I think, six weeks ago in its Netscape decision was looking at, is tech companies kicking messages off of social media? Is that speech? And one of the observations that this Court made was that, well, actually, there's very little that they kick off. Almost all of it goes up. And so I think that the — and this was an observation that the Supreme Court made in O'Brien — some kinds of conduct are imbued with First Amendment activity. And in this context, this is a boycott. This is what we all learn about in grade school. This is individuals finding something to do together. And the thing that they find to do together in Claiborne was to not — was to, quote, withhold their patronage from white businesses. And so there is — there is an element here where the — it's not as simple as, is the conduct inherently expressive or is it not inherently expressive? There is — there is more to that. And I think the Netscape decision, Your Honor, underscores that, that wrestling with what is — what is the nature of the conduct. Well, I agree with you that there's something more. I'm just not sure that the more helps you. Because the thing that is — that I can't get my brain around is Claiborne talks all about the First Amendment protections that apply to boycotts. But there's not a word in Justice Stevens' decision, as far as I can tell, that says anything about your right to boycott anybody using government money. So your clients are more than free to engage in whatever expressive viewpoint, boycott, whatever. You just can't engage in — you can't then go turn around and get a contract from the city of Houston using government money. Respectfully, Your Honor, we think that the — that this — this — this line, I think this slippery slope, the court — the Supreme Court dealt with in the 60s and the 70s in what are the permissible oaths that we can ask, you know, government employees to take. And in those cases, it was very clear that you can't — you can't require, you can't condition a government job or government work on, quote, abjuring future associational activities, unquote. That's the exact language. And I think here, because the boycott requires you to, one, not boycott at the moment you have to abandon any kind of speech, any kind of refuses to deal, any kind of associational activity that would drive a boycott. And then you also, for the lifetime of the contract, you have to promise not to do so in the future. That means not going to protests, not attending meetings. But the thing about all of that is that the — when the government places a condition in the contract, it's penalizing. It's coercive. And we think for that reason, the presence of this kind of contract, this kind of anti-BDS clause is impermissible. Well, let me ask you this. The Eighth Circuit's case, you know, the newspaper brought it, so undeniably, you know, they bring the First Amendment claim, some of the same amicus briefs that are filed in this case or filed in that case, similar, you know, clause, et cetera. And the proverbial question, whether Claiborne or, you know, Rumsfeld, you know, controls the . . . as I recall, the panel had held that there was a First Amendment violation. But anyway, the embanked court said no First Amendment violation, that any speech aspects were incidental because this was commercial. So I guess my question is, obviously the Eighth Circuit opinion doesn't bind us, but I'm just interested in your take. It's the same kind of clause, same sort of arguments being made. So, you know, what do we do with it? I mean, what's your . . . how do we distinguish that? I mean, we've got the same cases, so . . . Yes, Your Honor. The single error that I believe that the Eighth Circuit made was to prefer commercial conduct to expressive conduct. And that preference is incompatible with the last phrase of the boycott definition. The last phrase of the boycott definition says that boycotts generally include a refusal to deal, terminating business activities with, or taking any action that is intended to penalize, inflict, or harm. But there's one single carve-out of the any action, and that is an action that's made for ordinary business purposes. And so, again, you can boycott Israel for business purposes, but you cannot boycott Israel for an expressive purpose. And the teaching of Claiborne is, if nothing else, the teaching of Claiborne is that expressive conduct is to be preferred over, in that case, it was criminal conduct. In fair, it was more commercial conduct. In trial associations, it was more commercial conduct. And so that's the single thing that I think gives the game away in this context. I hear what you're saying. Maybe I'll read it again, but I'm not saying where I land on it, but I mean, I read it, the panel opinion. I read it in bank and everything in between. Same kind of clause. I mean, the distinction to me didn't seem to be around the language in the contract, which you seem to have made. It seemed to . . . was Claiborne or Rumsfeld governed. There, the court said, there's no expressive conduct. It's economical, etc., etc. So I'm just trying to get you to grapple with the same cases. But you seem to be saying, well, the distinction is in the language in the contract. Is that what you're saying? I think that the distinction is most obvious in the language. But if you go to fair, we've all been to law school. Those that have . . . during electronic times, you get just a list of jobs. You just get a list of jobs. And so that fact figured in the Supreme Court's decision that all the government was asking for was for the law school to add one job to the list of jobs that they were already going to provide all students. And the fact that that conduct was not inherently expressive was not simply that it was . . . you needed context around it, but given the context of employers approaching a professional school, seeking to recruit employees to join them, that has a lot more of an economic flavor than what's going on here. And so when you go to the Supreme Court's decision and Superior Court Trial Lawyers Association, they talk about the distinction in fair. And what the Supreme Court says is that it, quote, differed in a decisive way. Those who joined the Claiborne Hardware Boycott sought no special advantage for themselves. They didn't have an economic interest in Claiborne. They had a political interest. And because they had a political interest, that's why there was an extra level of protection there. But going beyond the way that the anti-BDS law violates the First Amendment in the context of Claiborne or the other cases we've mentioned, it is important to outline for this court a separate basis for it to invalidate the law, the fact that this anti-BDS clause compels speech. Any person reading this law, just as Rasmi Hassouna, no legal training reading this law, understands what it's intended to do. It's an effort aimed at a specific political movement, and that specific political movement involves some aspects of boycotting one foreign country. And so when a person like Rasmi Hassouna, American citizen, long-standing resident of Texas, immigrated from Gaza many decades ago, when he signs this, he is taking, the state of Texas is asking him to take a position on a matter of public concern. The matter of public concern is what are, as people, as companies, as a country, what is our relationship with this foreign country, and what are we to do with regards to any injustices that people seek to challenge. And just like in the oath cases, Colby, Richardson, Cramp, this is an oath that goes too far. By forcing Rasmi Hassouna and his company to disclose his position on the BDS movement, it's asking him to speak. And the reason why Texas has structured its law in this way is because some conduct can be done for expressive purposes, and that same conduct can be done for commercial purposes. And so Texas, as an outside observer, can't tell who is doing what, and so that's why Texas has put on contracting parties this requirement that they sign the oath. Claiborne is a high watermark for the First Amendment, and Judge Haynen, I think, underscored the importance of this case when he asked everybody to do a thought exercise. Cross the country Israel out of the loyalty oath and write something else in. Write a company, write another foreign country, and that's what's coming. So that's a quarter way down the slippery slope if this court doesn't uphold. Thank you, Your Honor. I'll begin with jurisdiction because, again, this court does not need to go any further than vacating the preliminary injunction because the Attorney General is entitled to sovereign immunity and interengineering lacks standing. My friend on the other side argued that the practical reality is that the Attorney General is going to defend this law. The fact is the statute doesn't contemplate any role for the Attorney General, and the only reason we are in this case is because we were sued by the company. Mr. Hamilton, if we agreed with you, we agreed with everything you said on Ex parte Young, and we wrote an opinion and vacated the PI, do they get to keep the three-year contract? Well, I suppose that depends on what, if anything, happens in separate litigation. There's no separate litigation? There is no separate litigation, but the case would then be moot because the company's claim against the city of Houston is now moot now that it has the contract, so the case would be over at that point. But the district court wouldn't have any ability to terminate the contract? No. So there would have to be some satellite litigation that we don't know anything about to get at the three-year contract? Yes. So contrarywise, suppose we disagree with you on jurisdiction and agree on the merits, and we say there's no First Amendment speech problem with the anti-BDS statute. Do they get to keep the three-year contract then? I'm not entirely sure, Your Honor. There would then be additional litigation in the district court, and I'm not sure. It's possible that we may have an argument. Here's an easier question. What about mootness now? Why isn't it moot now? They've got their contract, lost the injury. Right. It's moot with respect to the city of Houston, but none of our arguments depend on the fact that the contract has been executed. Our argument is there was never standing against the attorney general and that he was always entitled to sovereign immunity. So our argument isn't one of mootness. It's just one of a lack of standing. My friend on the other side provided no reason to distinguish the Eighth Circuit's decision in Arkansas Times against Waldrop. He cited the ordinary business purposes exception to the statute, but Arkansas statute, which is worded very similarly, also includes intent language. It says that the statute applies when conduct is, quote, in a discriminatory manner. So there really is no basis on which to distinguish Arkansas Times. Third, A&R Engineering cited the U.S. Supreme Court's decision in NAACP against Claiborne Hardware. It was a very different case, and it involved speech advocating for a boycott. At the beginning of the court's opinion, this is page 897 of Claiborne, the court actually puts the defendants in categories. It says that some defendants were boycott management. Some defendants were boycott enforcers. These were people standing outside boycotted businesses monitoring compliance. And then there was another set of defendants that were using violence and threats of violence to coerce compliance with the boycott. So the question of whether the right to refuse to deal business by itself was simply not before the court there. Excuse me. Claiborne instead dealt with advocacy for a boycott. Finally, A&R Engineering claims that they argue that there's some special political movement that's targeted here. But that's really no different than Rumsfeld against Fair. There, the U.S. Congress quite clearly targeted these law schools' organized protest of the U.S. military's don't ask, don't tell policy. Law schools remained free to discriminate against foreign service recruiters from the U.S. State Department. The statute only covered U.S. military recruiters. For these reasons, we ask this court would vacate the preliminary injunction. Thank you. All right. Thank you, counsel. That completes the three cases to be orally argued. We'll take them under submission in addition to the non-orally argued cases that are on today's docket. Having said that, the court stands in recess until 9 a.m. in the morning.